**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Daniel Casanova

    v.                          Civil No. 10-cv-485-JD

Hillsborough County Department
of Corrections, James O'Mara,
Superintendent, et al.


## REPORT AND RECOMMENDATION

Before the court is Daniel Casanova's complaint, construed
to include the original complaint, certain addenda, and an
amendment to the complaint, and attached exhibits (doc. nos. 1,
6, 8, 11, 13-16, 20, 22-24, and 26-28).  The court infers from
Casanova's complaint that he intends to name the following
defendants to this action: the Hillsborough County Department of
Corrections ("HCDOC"), Hillsborough County House of Corrections
("HCHC") Superintendent James O'Mara, HCHC Nurse Bill Foley,
HCDOC Health Services Administrator Denise Ryan, as well as HCHC
Corrections Officers ("COs") Weatherbee and Boyle.  The matter
is before the court for preliminary review to determine whether
or not Casanova has stated any claim upon which relief might be
granted.  See 28 U.S.C. § 1915A; United States District Court,
District of New Hampshire, Local Rule ("LR") 4.3(d)(2).

**Standard of Review**

Under LR 4.3(d)(2), when an incarcerated plaintiff or petitioner commences an action pro se, the magistrate judge conducts a preliminary review.  The magistrate judge may issue a report and recommendation after the initial review, recommending that claims be dismissed if the court lacks subject matter jurisdiction, the defendant is immune from the relief sought, the complaint fails to state a claim upon which relief may be granted, the allegation of poverty is untrue, or the action is frivolous or malicious.  See id. (citing 28 U.S.C. § 1915A & Fed. R. Civ. P. 12(b)(1)).  In conducting a preliminary review, the magistrate judge construes pro se pleadings liberally, to avoid inappropriately stringent rules and unnecessary dismissals.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976), to construe pleadings liberally in favor of pro se party); Castro v. United States, 540 U.S. 375, 381 (2003).

To determine if the complaint states any claim upon which relief could be granted, the court applies a standard analogous to that used in reviewing a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6).  The court decides whether the complaint contains sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face.  See Ashcroft v.
Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009).

     To make this determination, the court employs a two-pronged
approach.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1,
12 (1st Cir. 2011).  The court first screens the complaint for
statements that "merely offer legal conclusions couched as fact
or threadbare recitals of the elements of a cause of action."
Id. (citations, internal quotation marks and alterations
omitted).  A claim consisting of little more than "allegations
that merely parrot the elements of the cause of action" may be
dismissed.  Id.  The second part of the test requires the court
to credit as true all non-conclusory factual allegations and the
reasonable inferences drawn from those allegations, and then to
determine if the claim is plausible.  Id.  The plausibility
requirement "simply calls for enough fact to raise a reasonable
expectation that discovery will reveal evidence" of illegal
conduct.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).
The "make-or-break standard" is that those allegations and
inferences, taken as true, "must state a plausible, not a merely
conceivable, case for relief."  Sepúlveda-Villarini v. Dep't of
Educ., 628 F.3d 25, 29 (1st Cir. 2010); see Twombly, 550 U.S. at
555-56 ("Factual allegations must be enough to raise a right to
relief above the speculative level, on the assumption that all

the allegations in the complaint are true (even if doubtful in fact)." (citations and footnote omitted)).

Evaluating the plausibility of a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950 (citation omitted).  In doing so, the court may not disregard properly pleaded factual allegations or "attempt to forecast a plaintiff's likelihood of success on the merits." Ocasio-Hernández, 640 F.3d at 13.  "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." Id.

## Background

Daniel Casanova's claims in this case relate to injuries he suffered in 2008 and 2010, when he was in pretrial detention at the HCHC.  Casanova asserts that CO Weatherbee beat him up and broke his leg in 2008, and that CO Boyle beat him up and broke his ribs in 2010.  Casanova further asserts that he was unable to use the toilet or take a shower for 26 days, due to his confinement to a wheelchair in November and December 2008 and the HCHC's failure to provide him with access to wheelchair accessible shower and bathroom facilities, and that he received inadequate medical care while in HCHC custody.

1.   Weatherbee Assault

On November 4, 2008, Casanova was outside his cell in Unit 2B when he and another inmate began to argue.  Casanova took a step to approach the other inmate, and CO Weatherbee, who is a mixed martial arts competitor, told Casanova to get on the ground.  Casanova was complying with that order by getting down on the floor when Weatherbee kicked him, punched him in the face, and pinned him to the floor by placing his knee on Casanova's back.  During this assault, Weatherbee broke Casanova's leg.

Weatherbee picked Casanova up from the floor, put him into Cell 2102 (the "hole"), and made him kneel on the floor. Kneeling caused Weatherbee significant pain in his leg.

2.   2008 Conditions of Confinement and Broken Leg Treatment

Casanova told Weatherbee and others at the scene on November 4 that he needed medical help right away.  Nurse Bill Foley was summoned "immediately" after Weatherbee struck Casanova to check Casanova's knee.  Ltr. to Atty. Sheehan (doc. no. 24-1, at 7).  Foley said that the knee was only swollen and did not appear to be broken.  See id.  Foley saw Casanova kneeling on the ground after the assault, and made Weatherbee bend Casanova's leg.  See Ltr. to Court (doc. no. 24, at 1).

Foley said that if Casanova had broken his leg, he would not be able to move it at all.

Casanova's leg became badly swollen.  The pain and swelling interfered with Casanova's sleep, and it was unbearably painful for him to stand on that leg.  Casanova asserts that he submitted daily medical request slips about his leg, and that the Health Services Department ignored his complaints.

Two days after the injury, on November 6, 2008, HCHC staff sent Casanova to Dartmouth-Hitchcock Medical Center in Manchester, New Hampshire, to have his leg examined.  The November 6 medical records from Dartmouth-Hitchcock show that Casanova had been prescribed a narcotic analgesic along with Advil for pain, and that he had a knee brace.  The examining physician, Dr. Weintraub, ordered an x-ray and CT scan, which showed that Casanova had suffered a bone fracture in his right knee.  Dr. Weintraub determined that Casanova would need surgery and referred Casanova for an orthopaedic trauma consultation. The consultation took place on November 10, 2008.  See Medical Records (doc. no. 24-1, at 10-11, 14).  Dr. Weintraub's notes state that Casanova would need to elevate his leg and strictly avoid bearing weight on it.

Casanova was issued a wheelchair at some point prior to November 7, 2008.  Casanova asserts that while confined to a

wheelchair at HCHC, he could not use the shower or get up to go
to the bathroom for 26 days.  Casanova soiled himself and had to
urinate on the ground because he could not get out of the
wheelchair to use the bathroom.  See Ltr. (doc. no. 22, at 1).

On November 7, Casanova was due to appear in superior court
in Nashua, New Hampshire.  Because he could not walk, the
booking department arranged for Casanova to be sent to Nashua by
wheelchair transport.  When he arrived in Nashua, Casanova told
his attorney, Bonnie Howard, that he was hurt, and that the HCHC
Medical Department would not help him.  Attorney Howard, upon
seeing Casanova's badly swollen leg, told the judge in Nashua
that Casanova was injured.  Attorney Howard then directed her
investigator to take photos of Casanova's leg.

Both the county sheriff who transported Casanova to Nashua
and Attorney Howard contacted the HCHC to inquire about
Casanova's leg.  Attorney Howard spoke directly with
Superintendent O'Mara, who Casanova asserts said that Casanova
had not yet received treatment at a hospital for his leg injury.
Capt. Hiscoe provided a different response to the sheriff,
according to Casanova, telling the sheriff that Casanova had
been seen by a doctor in Manchester, New Hampshire.  Casanova

maintains that he did not receive any medical treatment until after the date of his hearing in Nashua.[1]

On November 10, 2008, Casanova was transported to Dartmouth Hitchcock Medical Center in Lebanon, New Hampshire, for an orthopaedic trauma consultation, pursuant to Dr. Weintraub's November 6 referral.  Dr. Kenneth Koval, an orthopaedic surgeon, examined Casanova, and surgery was scheduled for the next day. At that time, Casanova was taking Vicodin and Motrin three times a day.  See Outside Referral Form (doc. no. 28, at 37).

On November 11, 2008, Casanova underwent surgery at Mary Hitchcock Memorial Hospital in Lebanon, New Hampshire, to repair his knee.  Four screws were implanted in his leg.  His medications in the hospital included Phenergan, morphine, and oxycodone, and his discharge medications were Vicodin and Oxycontin, prescribed for 10 days.

---

[1]The record contains conflicting information as to when the Nashua hearing occurred, and when these calls were made on Casanova's behalf.  The original complaint, filed in 2010, asserts that Casanova appeared in Nashua on November 10, 2008, while in a letter to Attorney Michael Sheehan, mailed in 2009, Casanova stated that the Nashua hearing was held on November 7, 2008.  The medical records show that Casanova was seen by an orthopaedic surgeon in Lebanon, New Hampshire, on November 10, making it unlikely that he had been sent to a hearing in Nashua on the same day.  This court need not resolve at this time precisely when Casanova's attorney first saw the injury and called O'Mara, as that issue does not affect the court's decision regarding whether Casanova has stated any claim upon which relief can be granted.

On November 26, 2008, in the first of at least three follow-up appointments with Dr. Koval, Casanova reported that he had avoided bearing any weight on his right leg and had undertaken range of motion exercises on his own.  One month later, on December 23, 2008, Casanova reported to Dr. Koval that he was using a wheelchair and getting up to take a shower and go to the bathroom.  Dr. Koval directed Casanova at that time to gradually begin partial weight-bearing on his injured leg, over the next two to four weeks, using crutches.

In an appointment with Dr. Koval on January 19, 2009, Casanova indicated that he had been bearing full weight on his right leg, and stated that he felt he needed physical therapy. Dr. Koval noted in his plan for Casanova that he was cleared to bear weight on his right leg as tolerated, and that he "[c]ould begin physical therapy."  Office Notes (doc. no. 28 at 4).

Dr. Koval's January 19 office notes state that "patient will followup [sic] in a couple of months with Dr. Koval."  Id. A handwritten note on the record states that an appointment was made for March 18, 2009, with Dr. Koval.  See id.

On February 10, 2009, following Dr. Koval's treatment plan, Casanova underwent a physical therapy evaluation at the Elliot Outpatient Rehabilitation facility in Manchester, New Hampshire. He returned to that facility for sessions with a physical

therapist on March 16 and April 13, 2009.  The physical
therapist's notes for April 13 state that Casanova had achieved
the long term therapy goals, and that he would be discharged
with instructions for continuing to perform an independent home
exercise program.  See Medical Records (doc. no. 28, at 25 &
29).  The discharge notes state that Casanova had a "moderate
gait deviation," and that he reported that it still hurt to go
down stairs.  Id. at 29.  His medications listed in the HCHC
Outside Referral Form, dated April 13, 2009, included ibuprofen,
800 mg, two times per day.  Id. at 25.  X-rays taken on April
14, 2009, showed four pins in his knee, but no fracture or
dislocation in the knee.

Casanova was released from HCHC custody in July 2009, but
returned for a period of time in December 2009.  Casanova filed
a grievance relating to the November 2008 Weatherbee assault on
December 18, 2009.  In that grievance, Casanova asserted that he
was concerned that Weatherbee was still employed at HCHC, given
that he broke Casanova's leg in November 2008, and that HCHC
officials allowed eight days to pass before treating his broken
leg.  The HCHC official who responded to that grievance deemed
it "not factual," and Assistant Superintendent David Dionne, on
behalf of defendant O'Mara, determined that no further action
was required.  Inmate Grievance Form (doc. no. 26, at 2).

3.   <u>Boyle Assault</u>

On August 3, 2010, Casanova returned to the HCHC for
pretrial detention, having been charged with a sex crime.  On
that day, upon Casanova's intake to HCHC, Casanova asserts that
CO Boyle took him aside and kicked him in the left side.
Casanova suffered, and still suffers, pain in his side, and
believes that Boyle broke his ribs.

Casanova saw a doctor at HCHC on August 19, 2010, and
discussed his injuries with the doctor.  Casanova's ribs were
never x-rayed.  HCHC Health Services Administrator Denise Ryan
told him that his ribs would heal by themselves.

Casanova reported the assault by Boyle in a grievance form
submitted to HCHC supervisory officials on August 24, 2010.
Casanova complained in the grievance that Boyle attacked him
because of the sex crime charges pending against him.  In the
grievance, Casanova also asserted that a doctor he saw at HCHC
on August 19, 2010, told him that he had a kidney "fracture,"
and that kidney surgery could not be performed in jail.  Inmate
Grievance (doc. no. 23-1, at 1).  Casanova has not asserted in
this court that he suffered any kidney injury.

Casanova filed, as an addendum to his complaint, the HCHC
response to his grievance.  The officer responding to the
grievance (whose name is illegible) noted that he and Sgt.

Jordan met with Casanova on September 1, 2010, to talk about the
grievance.  Casanova told the officers that his kidneys were not
hurt, but he maintained that his ribs were injured.

The investigating officer further reported that Casanova,
while in the property room on August 3, 2010, clenched his
fists, took a step towards Boyle, and threatened to kill Boyle.
Boyle hit the distress button, immediately summoning assistance.
Staff members restrained Casanova.  Casanova did not claim that
he had been assaulted by Boyle to any HCHC employees who spoke
with him on August 3.  According to the investigating officer,
Casanova said that he had not complained sooner about the
incident because he was not a good speller.

The investigating officer recommended that no further
action be taken on the grievance.  Asst. Superintendent Dionne,
on behalf of defendant O'Mara, determined that no further action
was required.

4.   2010 Conditions of Confinement and Pain Management

A grievance attached to the complaint alleges that "Nurse
Liz" on December 1, 2010, denied him certain unspecified
"medications," because she was angry that he had gotten into an
argument with another inmate in her presence.  Inmate Grievance
Form (doc. no. 26, at 3).  Casanova grieved that the nurse had
said that she could deny him his medication because she was a

nurse and no one was going to stop her, and that she had done
the same thing to him before.  Id.  Defendant Ryan responded to
the grievance by asserting that Casanova's concerns "have been
addressed."  Id.  Asst. Superintendent David Dionne determined
that no further action was required, upon finding that the
medical department had addressed Casanova's complaint.

Casanova currently suffers constant pain in his ribs and
right knee making it hard to sleep and painful to climb steps.
See Ltr. to Court (doc. no. 11).  Casanova still walks with a
pronounced limp.  Casanova is housed in a cell that requires him
to climb a step.

In a grievance dated May 24, 2011, Casanova complained to
HCHC officials that defendant Ryan had failed to give him
Phenergan (an antihistamine), and narcotic pain medications,
including morphine, Vicodin, OxyContin, and oxycodone, which he
states he needs for his leg pain.  Ryan replied to that
grievance by asserting that only a doctor could prescribe those
medications, and that the doctor who had reviewed Casanova's
charts had prescribed a different medication, Motrin 600 mg, up
to three times per day.  Ryan further noted that Casanova was
taking only one of the prescribed doses of Motrin, and she
recommended that he take all three doses.  Assistant
Superintendent David Dionne, on behalf of defendant O'Mara,

determined that no further action was necessary on the grievance because a doctor had been treating Casanova since his arrival at HCHC on August 3, 2010, and that the doctor had prescribed medication for him.  See Inmate Grievance Form (doc. no. 22-2, at 3).

## Claims

Casanova has asserted the following claims in the Complaint (doc. nos. 1, 6, 8, 11, 13-16, 20, 22-24, and 26-28)[2]:

> 1.   CO Weatherbee is liable to Casanova under 42 U.S.C. § 1983 for using excessive force by assaulting Casanova on November 4, 2008, which violated Casanova's Fourteenth Amendment right to due process.

> 2.   CO Boyle is liable to Casanova under 42 U.S.C. § 1983 for using excessive force by assaulting Casanova on August 3, 2010, in violation of Casanova's Fourteenth Amendment right to due process.

> 3.   Defendants are liable under 42 U.S.C. § 1983 for violating Casanova's Fourteenth Amendment right to adequate medical treatment, by acting with deliberate indifference in: (a) denying Casanova timely treatment and diagnosis of a broken leg; (b) denying Casanova physical therapy for his leg post-surgery; (c) denying Casanova certain medications to relieve his pain and sleep problems; and (d) housing Casanova in a cell since August 2010 that requires him to ascend a step despite the pain he suffers when he climbs stairs.

> 4.   Defendants are liable under 42 U.S.C. § 1983 for violating Casanova's Fourteenth Amendment right not to suffer inhumane conditions of confinement in that he could

_____

[2]The claims as identified herein shall be construed to be the claims asserted in this action.  If Casanova disagrees with this identification of claims, he must properly file an objection to this Report and Recommendation, or a motion to amend the complaint.

not shower or use a bathroom while confined to a wheelchair
for 26 days, which caused him to soil himself and urinate
on the floor.

  5. Defendant Weatherbee and his employer are liable
under state law for the intentional tort of battery, for
Weatherbee's striking Casanova and breaking his leg on
November 4, 2008.

  6. Defendant Boyle and his employer are liable under
state law for the intentional tort of battery, for Boyle's
striking Casanova and injuring his ribs on August 3, 2010.

  7. Defendants are liable under state law for medical
malpractice.

## Discussion

## I. Federal Claims under 42 U.S.C. § 1983

Section 1983 creates a cause of action against those who,
acting under color of state law, violate federal constitutional
or statutory law.  See 42 U.S.C. § 1983; Wilson v. Town of
Mendon, 294 F.3d 1, 6 (1st Cir. 2002).  Here, Casanova has
claimed that defendants, all state actors, have violated rights
accruing to him under federal law.  As such, this action
presents claims arising under § 1983 (identified as Claims 1-4
above), along with state law claims identified above as Claims
5-7.  The viability of these claims is discussed below.

### A. Pretrial Detainee Status and Due Process Rights

While Casanova's status, since March 2011, has been that of
a convicted inmate awaiting sentencing, Casanova was a pretrial
detainee at the HCHC when the attacks allegedly occurred.

Casanova's claims relating to those assaults, inadequate medical
care, and other conditions of confinement arising prior to March
2011, must be analyzed under the Fourteenth Amendment, and not
the Eighth Amendment.  See Mosher v. Nelson, 589 F.3d 488, 493
n.3 (1st Cir. 2009) (citing Burrell v. Hampshire Cnty., 307 F.3d
1, 7 (1st Cir. 2002)); see also Lyons v. Powell, 838 F.2d 28, 29
(1st Cir. 1988) (per curiam) (rejecting Eighth Amendment
challenge to pretrial detention).

Detainees have a constitutional right under the Due Process
Clause to be free from punishment.  See Surprenant v. Rivas, 424
F.3d 5, 15 (1st Cir. 2005) (citing O'Connor v. Huard, 117 F.3d
12, 15 (1st Cir. 1997)).  "'[T]he State does not acquire the
power to punish with which the Eighth Amendment is concerned
until after it has secured a formal adjudication of guilt in
accordance with due process of law.'"  Martínez-Rivera v.
Sánchez Ramos, 498 F.3d 3, 9 (1st Cir. 2007) (quoting Ingraham
v. Wright, 430 U.S. 651, 671-72 n.40 (1977)).  Conditions or
restrictions which can be rationally related to some legitimate
administrative goal or security concern generally will not be
deemed unconstitutional "punishment."  O'Connor, 117 F.3d at 15.
Because the Due Process Clause prohibits the infliction of
punishment on a person prior to a judgment of conviction, the
issue in evaluating claims by a pretrial detainee is ultimately

whether the conditions of confinement were reasonably related to a legitimate state interest or were intended instead as punishment for the detainee's charged offense.  See Surprenant, 424 F.3d at 13; Collazo-Leon v. U.S. Bureau of Prisons, 51 F.3d 315, 317 (1st Cir. 1995).

> B.   Attacks by Weatherbee and Boyle

The Fourteenth Amendment protects a pretrial detainee from excessive force that amounts to punishment.  See Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir. 2007); Surprenant, 424 F.3d at 18.  In determining whether a plaintiff has stated a claim for unconstitutionally excessive force, a court should look to the following four factors: (1) the need for the use of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of injury inflicted, and (4) "whether the force was applied in good faith to maintain or restore discipline or maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 7 (1992).

Casanova has alleged that he suffered a broken leg and other serious injuries from the assaults at issue.  CO Weatherbee attacked Casanova in response to Casanova arguing with another inmate and stepping towards that inmate. Weatherbee ordered Casanova to go down to the ground.  Casanova alleges that he was complying with that order when CO Weatherbee

struck him in the face, kicked him, and pinned him down with his knees on his back.  The attack broke Casanova's leg.  Casanova's allegations describe an attack that was disproportionate to the circumstances, that was sufficiently violent to demonstrate an intention to inflict punishment rather than to maintain order, and that caused Casanova to suffer a serious injury.  These facts are sufficient to state an excessive force claim against Weatherbee.

Boyle's attack followed Casanova's 2010 return to HCHC on sex crime charges.  An addendum to the complaint, consisting of an investigating officer's response to Casanova's grievance about the attack, asserts that Casanova threatened to kill Boyle on August 3, 2010, and that the threat precipitated the physical restraint of Casanova.  Casanova has maintained, however, that Boyle beat him up to punish him for the charges pending against him, and that Boyle's attack broke Casanova's ribs and left him suffering severe pain in his side more than six months later.

Without resolving the factual dispute as to the cause of the altercation or expressing an opinion on the extent of Casanova's injuries, the court finds that Casanova has pleaded sufficient facts at this time to state a claim that Boyle used unconstitutionally excessive force against him on August 3, 2010.  In an order issued simultaneously with this report and

recommendation, the court has directed service of the section 1983 excessive force claims (identified above as Claims 1 and 2) upon defendants Weatherbee and Boyle.

    C.   <u>Supervisory and Municipal Liability for Assaults</u>

The complaint does not include any allegations demonstrating a basis for finding supervisory or municipal liability for the attacks.  <u>See</u> <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 275 (1st Cir. 2009) (supervisory liability under section 1983 lies only where "supervisor's conduct led inexorably to the constitutional violation"); <u>Young v. City of Providence ex rel. Napolitano</u>, 404 F.3d 4, 25 (1st Cir. 2005) ("it is only when the governmental employees' 'execution of a government's policy or custom . . . inflicts the injury' and is 'the moving force' behind the constitutional violation that a municipality can be liable" under section 1983 (citation omitted)).  Here, Casanova has not stated any facts to support an assertion that a supervisor's conduct "led inexorably" to the use of excessive force against him.  Further, Casanova has not stated that the assaults were undertaken pursuant to any government policy or custom.  Accordingly, any claim of supervisory or municipal liability for the assaults intended to be asserted under section 1983, should be dismissed.

D.   <u>Medical Care</u>

The standard to be applied to a pretrial detainee's Fourteenth Amendment claim, asserting that he has suffered a denial of adequate medical care while in custody awaiting trial, is essentially the same as that applied to claims asserted by convicted criminals under the Eighth Amendment's cruel and unusual punishment clause.  <u>See</u> <u>Surprenant</u>, 424 F.3d at 18 (liberty interests at stake in Fourteenth Amendment claim of detainee "are coextensive with those of the Eighth Amendment's prohibition against cruel and unusual punishment").

The Eighth Amendment shields convicted inmates from officials acting with deliberate indifference to their serious medical needs.  <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 831 (1994). The Supreme Court has adopted a two-part test for reviewing medical care claims under the Eighth Amendment.  <u>See</u> <u>id.</u> at 834. A court must first determine if the prisoner has alleged facts sufficient to show that he or she has not been provided with adequate care for a "serious medical need."  <u>Id.</u>  Second, the court must determine if the complaint contains sufficient allegations to show that defendants acted with deliberate indifference in failing to provide adequate care to address that serious need.  <u>See</u> <u>id.</u>

To be found deliberately indifferent, a prison official must be both subjectively aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also actually draw the inference.  See Farmer, 511 U.S. at 837.  Deliberate indifference "may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with 'actual knowledge of impending harm, easily preventable.'"  Ruiz-Rosa, 485 F.3d at 156 (citation omitted).

Deliberate indifference may be found "in wanton decisions to deny or delay care, where the action is reckless, not in the tort law sense but in the appreciably stricter criminal-law sense."  Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993) (internal citation and quotations omitted).  Allegations that simply show "substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation."  Ruiz-Rosa, 485 F.3d at 156.

### 1.   Broken Leg

A serious medical need is one that involves a substantial risk of serious harm to the prisoner if it is not adequately treated.  See Barrett v. Coplan, 292 F. Supp. 2d 281, 285 (D.N.H. 2003); see also Gaudreault v. Mun'y of Salem, 923 F.2d

203, 208 (1st Cir. 1990) (defining serious medical need as one
"that has been diagnosed by a physician as mandating treatment,
or one that is so obvious that even a lay person would easily
recognize the necessity for a doctor's attention").  If a
medical care claim is based on delayed provision of care, the
inquiry is whether the delay caused or gave rise to a
substantial risk of serious harm to the prisoner.  See Chambers
v. N.H. Prison, 562 F. Supp. 2d 197, 200 (D.N.H. 2007).

a.   Physical Therapy

Casanova asserts that he never received prescribed physical
therapy post-surgery.  The medical records included with the
complaint, and deemed to be a part of the complaint for all
purposes, belie that assertion.  On January 19, 2009, Dr. Koval
recorded a note stating that Casanova could begin physical
therapy.  A physical therapist met with Casanova in February,
March, and April 2009, and determined at the last of those
meetings that the goals of physical therapy had been reached.
The physical therapist also provided Casanova with a home
exercise program to follow after he was discharged from
outpatient therapy.  The complaint lacks any allegations
suggesting that the therapy provided was medically insufficient
or that Casanova suffered any substantial risk of serious harm
relating to the physical therapy he received.  Accordingly, the

court should dismiss the claim of inadequate medical care based
on the alleged failure to provide him with physical therapy, as
the claim is refuted by the facts shown in the complaint.

        b.    <u>Diagnosis and Treatment</u>

Casanova has pleaded facts showing that he suffered a
broken leg on November 4, 2008, and that the injury caused him
severe pain, particularly when Weatherbee forced him to kneel.
The pain made it difficult for him to stand or sleep, and he
continues to suffer pain and walk with a limp today.  Casanova
has therefore pleaded facts sufficient to show that he suffered
a serious medical need, consisting of a broken bone, resulting
in pain, instability in his leg, walking difficulties, and sleep
problems, beginning on November 4, 2008.

Casanova has asserted that he received no treatment for his
broken leg for more than a week after his leg was broken on
November 4, and that during that time, the HCHC medical staff
repeatedly ignored his requests for help.  The records and other
documents attached to the complaint, considered to be part of
the complaint for all purposes, provide a more nuanced picture
of the course of Casanova's medical care and undermine his bare
claim of no care.  The facts show that immediately after the
incident on November 4, a nurse summoned to the scene at least
cursorily examined Casanova's leg.  Two days later, on November

6, Dr. Weintraub properly diagnosed Casanova's leg and referred him for a surgical consultation.  By November 6, Casanova had been issued a knee brace and received orders for pain medication, elevation, and strict non-weight bearing.  The facts alleged in the complaint, and shown by the medical records and other exhibits considered to be part of the complaint, thus show that Casanova was triaged immediately by a nurse, and, at most, two days passed before Casanova was thoroughly and properly diagnosed and received pain medication, a brace, and orders to elevate and avoid bearing weight on his leg.  Less than a week passed after that diagnosis before corrective surgery occurred. In this case, the court need not decide whether that limited delay in diagnosis and treatment presented a substantial risk of serious harm, because, for reasons stated below, Casanova has failed to satisfy the remaining requirement for stating a viable claim, that a prison official acted with

"deliberate indifference" to such a risk.  Farmer, 511 U.S. at 834.

### 2.   Deliberate Indifference

"In order to establish deliberate indifference, the complainant must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain."  Braga v. Hodgson, 605 F.3d 58, 61 (1st Cir. 2010) (internal citation and

quotations omitted).  As to the broken leg, Casanova has
asserted that Nurse Foley is liable.  The complaint shows that
immediately after Weatherbee struck him, Nurse Foley looked at
Casanova's leg and determined that it did not appear to be
broken, because Casanova could move it.  There are no
allegations showing that Foley intended wantonly to inflict pain
upon Casanova or otherwise possessed a culpable state of mind in
the course of examining Casanova.  See id.; see also Watson, 984
F.2d at 540.  Foley's examination of Casanova and his remarks at
the scene may have manifested a lack of skill and sympathy, or,
in the alternative, simply reflected the difficulty of
diagnosing a fracture like Casanova's at the scene.  The facts
alleged do not show, however, that Foley was deliberately
indifferent to Casanova's medical needs on November 4.

Casanova has identified no other HCHC officer or staff
member who was deliberately indifferent to his medical needs.
Superintendent O'Mara is not alleged to have been aware of, much
less deliberately indifferent to, Casanova's medical needs at
any time before Casanova's attorney contacted him on or about
November 7, 2011.  Casanova's complaint includes facts
indicating that after his attorney contacted O'Mara, Casanova
was properly treated.  Thus, the facts alleged fail to show that
O'Mara was deliberately indifferent to Casanova's medical needs.

25

As to Casanova's rib injury, Casanova has specifically alleged that his ribs were not x-rayed, that defendant Ryan told him that his ribs would heal by themselves, and that in his grievance relating to Boyle's attack, he asserted that a doctor told him on August 19, 2010, that he suffered a fractured kidney which could not be repaired surgically at HCHC.  The court infers from the facts alleged that Casanova discussed his August 3 injuries with a physician at HCHC no later than August 19, 2010, and that the physician told Casanova that he could not perform surgery for the "fracture" he suffered.  Casanova has asserted no facts suggesting that a decision not to x-ray his ribs or provide him with pain medication only, manifested deliberate indifference to any serious medical need.

As to the constant pain that disrupts his sleep and renders stair climbing painful, the complaint addendum includes Ryan's reply to Casanova's May 2011 grievance indicating that the doctor who examined Casanova's charts prescribed only Motrin. Casanova has not specifically denied that he has a Motrin prescription; rather, he has expressed a need for a particular set of drugs that the court infers have not been recently prescribed for him.  A disagreement regarding appropriate medical treatment for a medical condition, however, is insufficient to support a claim for a constitutional violation.

See Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 162 (1st Cir. 2006).

Casanova has further alleged that on one occasion in December 2010, "Nurse Liz" denied medications prescribed for him because she was angry and felt that she had the prerogative to do so.  That evidence, however, coupled with further, undisputed information showing that his grievance was investigated and resolved by defendant Ryan, does not provide a basis for any plausible claim of Ryan's deliberate indifference to his pain.[3]

By the same token, Casanova has claimed that defendants failed to provide him with level housing, which he believes he needs because climbing steps is painful.  Casanova has provided a grievance dated May 2011, indicating that defendant Ryan was aware that he had to climb a step to get to his cell, and that it is painful for him to climb.  He has not shown, however, that Ryan or any other defendant intended wantonly to inflict pain upon him through his housing arrangements, given that a physician has prescribed treatment for Casanova's pain.  The complaint provides no basis upon which the court could

_____

[3]Casanova has not specifically asserted that "Nurse Liz" is liable to him for denying him care for a serious medical need. Lacking information regarding the nature of the medication at issue and how the nurse's decision to deprive him of one or more doses may have affected him, the court finds that Casanova has failed to state a cognizable section 1983 medical care claim against Nurse Liz.

reasonably infer deliberate indifference to the pain he feels in climbing, based only on the allegation that his housing is not on one level, and this claim should be dismissed.

Casanova has failed to show that any defendant has been deliberately indifferent to any serious medical need. Accordingly, the court should dismiss Casanova's section 1983 medical care claims (Claims 3-4).

### E.   Unsanitary Conditions

"A pretrial detainee's claim that he has been subjected to unconstitutional conditions of confinement implicates Fourteenth Amendment liberty issues." See Surprenant, 424 F.3d at 18.  To state a viable claim, "a plaintiff's claim must meet both objective and subjective criteria."  Id.

> First, the plaintiff must establish that, from an objective standpoint, the conditions of his confinement deny him the minimal measure of necessities required for civilized living.  Second, the plaintiff must show that, from a subjective standpoint, the defendant was deliberately indifferent to inmate health or safety.  Deliberate indifference, in this sense, is a mental state akin to criminal recklessness.

Id. (citations and footnote omitted).

Here, Casanova has alleged facts showing that he lacked access to a toilet or shower for 26 days, and that he soiled himself and urinated on the floor, while confined to a wheelchair.  The court infers that the 26 day period occurred in November and early December 2008.  Such facts are analogous to

those deemed sufficient by other courts to show that a detainee has been denied the minimum measure of necessities for civilized living.  See, e.g., id. at 19 (upholding jury verdict of unconstitutional conditions of confinement based on evidence that inmate was allowed to shower only every three days, that he was denied hygienic products, that individual guards could deny him access to water including water to flush, and that he was subjected to daily searches requiring him to place unwashed fingers in his mouth).

Dr. Weintraub, on November 6, had ordered Casanova's leg placed in a knee immobilizer, and further ordered that the leg be elevated and weight bearing be strictly avoided.  Similar orders were issued for Casanova post-operatively.  Under such circumstances, it is reasonable to infer that the HCHC health services staff would be aware of Casanova's need for an accessible shower or toilet for the period of his wheelchair confinement, to avoid unsanitary conditions.  Furthermore, taking the facts alleged by Casanova to be true, it is undoubtedly the case that any prison official with whom Casanova had contact during that 26-day period of time would be aware of Casanova's exposure to feces or urine.  The circumstances alleged here are so odious as to raise a presumption that the

failure to act upon such knowledge amounted to deliberate indifference to Casanova's health.

Casanova has not specifically named a corrections officer or health care provider who he considers liable for this claim. The court infers, however, that Denise Ryan, as the director of the HCDOC Health Services, would have been aware of Casanova's physician's orders and his confinement to a wheelchair, and that both Ryan and Superintendent O'Mara bore the responsibility of assuring that Casanova was provided with medically appropriate facilities, given his condition and the limitations on his mobility.  Accordingly, the court will direct service of this claim on Ryan and O'Mara.[4]

II.  State Law Claims

This court has supplemental jurisdiction over the state law claims that arise out of the same case or controversy as the

---

[4]After the complaint has been served, Casanova may serve interrogatories upon defendants seeking the name of any other individual who he believes is liable for deliberate indifference to his exposure to unsanitary conditions in November/December 2008.  See Fed. R. Civ. P. 33(a) (party may serve on any other party no more than 25 written interrogatories, regarding any nonprivileged matter relevant to party's claim or defense); see also Fed. R. Civ. P. 26(a)(1)(B); Fed. R. Civ. P. 26(d)(1) (inmate litigation is exempt from limitations on timing of discovery).  Casanova may thereafter seek to amend the complaint to add that individual as a defendant.  See Fed. R. Civ. P. 15(a) (complaint may be amended once within 21 days after defendant serves answer or moves to dismiss complaint, and thereafter plaintiff may amend complaint upon parties' consent or with court's leave).

section 1983 claims.  See 28 U.S.C. § 1367.  Under state law, a
person who intentionally strikes and injures another may be
liable in tort, see Silva v. Warden, 150 N.H. 372, 374, 839 A.2d
4, 6 (2003), and that person's employer may be held vicariously
liable if the act was performed in part to serve the employer,
see Daigle v. City of Portsmouth, 129 N.H. 561, 580-81, 534 A.2d
689, 699-700 (1987).

The facts alleged in the complaint are sufficient to state
viable tort claims against Weatherbee, Boyle, and their employer
for the injuries sustained by Casanova due to the November 2008
and August 2010 attacks.  Accordingly, in an Order issued this
date, the court directs service of Claims 5 and 6 upon those
defendants.

If this court should accept this Report and Recommendation,
recommending that the section 1983 medical care claims be
dismissed, it should decline to exercise supplemental
jurisdiction over any state law malpractice claims related to
Casanova's injuries.  The malpractice claims involve different
defendants, different injuries, and different evidence than the
assault and battery claims to be served in this case.  Expert
testimony would likely be necessary to prove any medical
malpractice claim, and such evidence, while potentially time-
consuming and complicated, would not be relevant to the 1983

31

claims in this case.  See 28 U.S.C. § 1367(b) (court may decline to exercise supplemental jurisdiction over state law claims that may substantially predominate over the claims over which district court has original jurisdiction).  Therefore, the court should dismiss the state law malpractice claims, identified above as Claim 7.

III. Criminal Charges

Casanova has asserted that Weatherbee's and Boyle's assaults were crimes, and that he intends to bring criminal charges against them.  Casanova, however, lacks standing to prosecute defendants for a criminal offense, or to attempt to compel such a prosecution through a civil action.  See Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); Cok v. Cosentino, 876 F.2d 1, 2 (1st Cir. 1989).  To the extent Casanova seeks to assert criminal charges in this case, such claims must be dismissed.

**Conclusion**

In an Order issued this date, the court has directed service of Claims 1-2, and 4-6, as identified above.  Claim 7 should be dismissed without prejudice to Casanova's filing a malpractice claim in state court.  The remaining claims in the

complaint should be dismissed with prejudice, for failure to state a claim upon which relief can be granted.

Any objections to this report and recommendation must be filed within fourteen (14) days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010); United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008).

_____
Landya McCafferty
United States Magistrate Judge

Date: July 25, 2011

cc:  Daniel Casanova, pro se

LBM:nmd

33